**LAN SANG, Plaintiff,**

v.

**MING HAI and Law Offices of Ming Hai, P.C., Defendants.**

**No. 12 Civ. 7103(JPO).**

United States District Court, S.D. New York.

June 27, 2013.

510

Allan Steven Schiller, Schiller Law Group, PC, New York, NY, for Plaintiff.

Dianna L. Daghir McCarthy, Tania Jaynelle Mistretta, Winget, Spadafora & Schwartzberg, LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

J. PAUL OETKEN, District Judge:

This is a case concerning provocative public statements allegedly made by an attorney, Ming Hai, about his former client, a well-known Chinese celebrity, Lan Sang. Sang brings this action against Hai and the Law Offices of Ming Hai, P.C. ("Defendants"), alleging, *inter alia*, libel and slander. Defendants now move to dismiss the case in its entirety, or in the alternative, to transfer the action under the first-to-file doctrine. For the reasons that follow, Defendants' motion to dismiss is granted in part and denied in part, and Defendants' motion to transfer is denied.

## I. Background

The following facts are taken from Plaintiff's Second Amended Complaint ("SAC"), the allegations of which are assumed to be true for purposes of this motion, as well as from certain documents of which the Court may take judicial notice. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110–111 (2d Cir. 2010).

### A. Factual Background

#### 1. The Parties

Plaintiff Lan Sang is a former gymnast who was, for a time, internationally recognized as one of China's greatest vaulters. At the age of 17, she participated as a member of the Chinese team in the 1999 Goodwill Games. During the warm-up for her final event, Plaintiff suffered an injury

that paralyzed her from the chest down. She has since been permanently confined to a wheelchair.

Defendant Ming Hai, Esq. previously represented Lan Sang in a case against AOL Time Warner, Inc., among others, in the Southern District of New York ("the AOL Time Warner action"). (*See* Dkt. No. 21 ("McCarthy Decl."), Ex. B.)

Defendant Law Offices of Ming Hai, P.C. is a law firm owned by Hai with its principal place of business in New York State. Plaintiff hired this firm to represent her in the AOL Time Warner case.

## 2. The Statements

Following settlement of the AOL Time Warner action, Sang and Hai had a falling out. Thereafter, Hai made several statements about Plaintiff, which are the subject of this lawsuit. Plaintiff alleges that each statement was false.

These statements were made through three different avenues. First, some were made on Hai's online law blog ("the Blog"), which is operated through the internet service provider Tencent Weibo. The Blog is published in a Chinese language and is ostensibly read by millions of people, mostly in China. Second, on or about October 21, 2011, Hai made statements regarding the progress of a civil action he had brought against Plaintiff at a press conference he held in front of the Queens County Civil Courthouse. Third, on or about March 2012, Defendant made statements about Plaintiff in an interview to reporter Lijing Bian.

For convenience's sake, the Court has organized the allegedly defamatory statements by subject matter into four groups:

(1) the Bestiality Statement, (2) the Criminal Activity Statements; (3) the Mistress Statements; (4) the Lawsuit Statement. The content of each is described in turn.[1]

### a. Bestiality Statement

On September 26, 2012, Hai published the following on the Blog about Plaintiff and her boyfriend and former manager Huang Jian:

> But, what disgusted me the most was that Sang Lan allowed Huang Jian to sexually ill-treat her dog Xiaomei. That day during a meal at their home, the two of them said that Xiaomei had a strong sex drive, and always rode on Huang Jian. Sang Lan said Huang Jian wanted to sexually assault Xiaomei by wearing condoms. I immediately said 'Shut up!' I could not listen to that any more. It was disgusting. I am a determined animal defender. Have they no shame? Since then, I particularly disliked them.

### b. Criminal Activity Statements

On September 26, 2012, Hai wrote on the Blog that "Sang Lan has defaulted on her rent and stole the keys. She also accused me of misleading her."

In or about March 2012, Hai stated the following in an interview to reporter Lijing Bian: "Lang San provided me falsified evidence for her case."

### c. Mistress Statements

On September 21, 2012, Hai published the following statements on the Blog:

> Lan Sang said that if Huan Jian abandoned her, then she would come to the United States and be Hai Ming's mistress.

---

1. As will become readily apparent to the reader, the translations of the alleged statements appear to leave much to be desired. Perhaps better translations will become available later in the litigation, just as later translations of foreign novels are often better than their forbearers. *Compare* Leo Tolstoy, *Anna Karenina* (Richard Pevear and Larissa Volokhonsky trans., 2000) *with* Leo Tolstoy, *Anna Karenina* (Constance Garnett trans., 1901).

She also told me how bad my wife is and how nice she is.

On September 26, 2012, Hai also made the following statement on the Blog: "Would I accept this mistress? I helped her because I didn't think I was a nice guy, and I would like to help the disabled to accumulate virtue for myself. But, out of expectation, I got bitten by the snake."

#### d. The Lawsuit Statements

On or about October 21, 2011, Hai held a press conference in front of the Queens Civil Courthouse and made statements regarding the progress of a civil action he had brought against Plaintiff.[2] Specifically, at that press conference, he said the following:

> I won prosecution for delinquent legal fees for all 12 charges against Lan Sang. [B]ecause [Lan Sang] did not appear in the Court, the Court granted a default judgment, a default judgment means that all of our prosecution was approved, all of the counterclaims of the Defendant were rejected. We sued for 12 charges; each charge is for $25,000; so we won $300,000.

#### 3. Hai's Lawsuit

This is not the first lawsuit stemming from the parties' falling out. On or about August 25, 2011, Hai sued Sang in Civil Court of the City of New York, County of Queens, alleging, *inter alia*, defamation, failure to pay legal fees, and assault. (McCarthy Decl., Ex. C.)

#### B. Procedural Background

Plaintiff initiated this action on September 20, 2012. (Dkt. No. 1). Plaintiff has since amended her complaint twice, on October 10, 2012 and December 18, 2012.

(*See* Dkt. Nos. 7 & 16 ("SAC")). On January 28, 2013, Defendants moved to dismiss all of Plaintiff's claims or, in the alternative, to transfer the case to the Civil Court of the City of New York, County of Queens. (Dkt. No. 22 ("Defs.' Mem.")). Plaintiff filed a memorandum in opposition to the motion to dismiss on February 28, 2013 (Dkt. No. 24 ("Pl.'s Opp'n.")), to which Defendants replied on March 4, 2013 (Dkt. No. 27 ("Defs.' Rep.")).

### II. Discussion

#### A. Jurisdiction

Lan Sang is a foreign national who does not reside within New York. (SAC at ¶ 9). Ming Hai is a resident of Nassau County, New York. (*Id.* at ¶ 10). The Law Office of Ming Hai, P.C. has its principal place of business in the Southern District of New York. (*Id.* at ¶ 11). The amount in controversy in this action exceeds $75,000. (*Id.* at ¶ 5). Because there appears to be complete diversity, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).

#### B. Standard of Review

 As a general rule, when deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court is obliged to "accept as true all of the factual allegations contained in the complaint," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 572, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), drawing "all inferences in the light most favorable to the non-moving party's favor." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir.2007). At this stage, courts are "not limited to the face of the complaint," but "may [also] consider," *inter alia*, "any written instrument at-

---

**2.** The SAC alleges that the press conference took place on October 11, 2011 and later alleges that it took place on October 21, 2011.

(SAC at ¶¶ 20, 23). It is unclear on which date the press conference actually took place.

tached to the complaint...." *In re Scottish,* 524 F.Supp.2d 370, 382 (S.D.N.Y. 2007) (internal quotation marks omitted).

■ While Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R.Civ.P. 8(a)(2), in order to avoid dismissal, a plaintiff must state "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'n, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). Stated differently, to survive a motion to dismiss, a plaintiff's facts must give rise to a plausible narrative supporting his claim. *See Twombly,* 550 U.S. at 570, 127 S.Ct. 1955 ("Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").

### C. The First–to–File Doctrine

■ At the outset, the Court considers, and rejects, Defendants' argument that Plaintiff's claim should be transferred to the Civil Court of the City of New York pursuant to the first-to-file doctrine, because Defendant commenced litigation against Plaintiff in that court prior to the filing of this action. "The first-to-file doc-

trine applies where there is concurrent *federal* litigation, not where a federal court contends with concurrent state litigation." *Port Auth. of N.Y. and N.J. v. Kraft Power Corp.,* No. 11 Civ. 5624(HB), 2012 WL 832562, at *1 (S.D.N.Y. Mar. 13, 2012) (citing cases); *see also Radioactive, J.V. v. Manson,* 153 F.Supp.2d 462, 473 (S.D.N.Y. 2001) ("The first-to-file doctrine applies to concurrent federal litigation—not concurrent state/federal litigation."). Accordingly, the first-to-file doctrine is simply inapplicable here. Defendants' motion to transfer this action to the Civil Court of the City of New York pursuant to the first-to-file doctrine is therefore denied.

### D. The Defamation Claims
#### 1. The Law of Defamation

■ "Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Biro v. Condé Nast,* 883 F.Supp.2d 441, 456 (S.D.N.Y.2012) (quoting *Idema v. Wager,* 120 F.Supp.2d 361, 365 (S.D.N.Y.2000)). "The elements of a cause of action [to recover damages] for defamation are a false statement, published without privilege or authorization to a third party, ... fault ... and ... either [causing] special harm or [constituting] defamation per se." *Epifani v. Johnson,* 65 A.D.3d 224, 233, 882 N.Y.S.2d 234 (2d Dep't 2009) (quoting *Salvatore v. Kumar,* 45 A.D.3d 560, 845 N.Y.S.2d 384, 388 (2d Dep't 2007)) (internal quotation marks omitted); *see also Church of Scientology Int'l v. Behar,* 238 F.3d 168, 173 (2d Cir. 2001) (explaining that a public figure alleging defamation under New York law must establish that "the statements ... were (1) of and concerning [the plaintiff], (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice").[3] A defamatory

---

**3.** Because a statement must be false to be

defamatory; it is "fundamental that truth is an

statement is one that exposes the plaintiff "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induces an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society." *Karedes v. Ackerley Grp., Inc.,* 423 F.3d 107, 113 (2d Cir. 2005) (quoting *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 177 (2d Cir.2000)).

 "Whether particular words are defamatory presents a legal question to be resolved by the court[s] in the first instance." *Celle,* 209 F.3d at 177 (quoting *Aronson v. Wiersma,* 65 N.Y.2d 592, 593, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (N.Y. 1985)) (alteration in original). It is ultimately "the responsibility of the jury to determine whether the plaintiff has actually been defamed; however, a threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible of the defamatory meaning imputed to it." *Levin v. McPhee,* 119 F.3d 189, 195 (2d Cir.1997) (citing *James v. Gannett Co.,* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 353 N.E.2d 834 (N.Y.1976)). "Statements that are not 'reasonably susceptible of defamatory meaning' are not actionable." *Biro,* 883 F.Supp.2d at 457 (citing *Qureshi v. St. Barnabas Hosp. Ctr.,* 430 F.Supp.2d 279, 287 (S.D.N.Y.2006)).

 Allegedly defamatory statements should be construed "as they would be commonly understood ... in the context of their publication." *Levin,* 119 F.3d at 195 (citing *Armstrong v. Simon & Schuster, Inc.,* 85 N.Y.2d 373, 381, 625

N.Y.S.2d 477, 649 N.E.2d 825 (1995)); *see also Krepps v. Reiner,* 588 F.Supp.2d 471, 484 (S.D.N.Y.2008) ("Allegedly defamatory statements should be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed." (internal quotation marks omitted)). "Challenged statements are not to be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." *Celle,* 209 F.3d at 177 (quoting *November v. Time Inc.,* 13 N.Y.2d 175, 178, 244 N.Y.S.2d 309, 194 N.E.2d 126 (1963)). The New York Court of Appeals instructs courts not to "strain to interpret [ ] writings in their mildest and most inoffensive sense [so as] to hold them nonlibelous." *November,* 13 N.Y.2d at 178, 244 N.Y.S.2d 309, 194 N.E.2d 126 (citation and internal quotation marks omitted). At the same time, however, a court should not "render statements actionable by giving them a 'strained or artificial construction.'" *Qureshi,* 430 F.Supp.2d at 287 (quoting *Dillon v. City of New York,* 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (1st Dep't 1999)); *see also Krepps,* 588 F.Supp.2d at 484 ("[I]t is equally clear that courts should not strain to interpret statements as defamatory.").

 Where an allegedly defamatory statement can be reasonably construed as having more than one meaning, only some of which carry a defamatory connotation, whether the statement is defamatory is a question of fact for the jury. *See Celle,* 209 F.3d at 178 ("If the words are reasonably susceptible of multiple meanings,

---

absolute, unqualified defense to a civil defamation action." *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 301 (2d Cir.1986) (citation omitted). Indeed, if an allegedly defamatory statement is "substantially true," a claim of libel is "legally insufficient and ...

should [be] dismissed." *Id.* Plaintiff has alleged that the relevant statements were all false. Thus, the defense of truth is—at this stage of the litigation, in any event—inapplicable to this case.

some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." (internal quotation marks omitted)).

### a. Statements of Opinion

 Under New York law, "statements of pure opinion are not actionable as defamation." *Qureshi*, 430 F.Supp.2d at 288 (citing *Gross v. New York Times Co.*, 82 N.Y.2d 146, 151, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (N.Y.1993)); *see also Levin*, 119 F.3d at 196 ("[E]xpressions of opinion are not actionable ..."); *Mann v. Abel*, 10 N.Y.3d 271, 276, 856 N.Y.S.2d 31, 885 N.E.2d 884 (N.Y.2008) ("Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation."). "This is because a statement of opinion is not an assertion of fact that can be proved false, and an assertion that cannot be proved false cannot be held libelous." *Biro*, 883 F.Supp.2d at 460 (citation and internal quotation marks omitted); *see also Brian v. Richardson*, 87 N.Y.2d 46, 51, 637 N.Y.S.2d 347, 660 N.E.2d 1126 (N.Y.1995) ("Since falsity is a *sine qua non* of a libel claim and since only assertions of fact are capable of being proven false, we have consistently held that a libel action cannot be maintained unless it is premised on public assertions of *fact*." (emphasis in original)); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection."). "Thus, an expression of pure opinion is protected however unreasonable the opinion or vituperous the expressing of it may be." *Biro*, 883 F.Supp.2d at 460 (citation and internal quotation marks omitted).

 "Whether a statement is one of fact or opinion is a question of law for the court." *Id.* (citing *Mann*, 10 N.Y.3d at 276, 856 N.Y.S.2d 31, 885 N.E.2d 884). Thus, courts must undertake the "often complicated task of distinguishing between potentially actionable statements of fact and nonactionable expressions of opinion." *Qureshi*, 430 F.Supp.2d at 288; *see also Brian*, 87 N.Y.2d at 51, 637 N.Y.S.2d 347, 660 N.E.2d 1126 ("Distinguishing between assertions of fact and nonactionable expressions of opinion has often proved a difficult task."). In delineating potentially actionable statements from nonactionable expressions of opinion, New York courts look to three factors:

(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Biro*, 883 F.Supp.2d at 460 (quoting *Gross*, 82 N.Y.2d at 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163). "When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact." *Levin*, 119 F.3d at 197 (citation omitted). Often, statements of "rhetorical hyperbole" or "imaginative expression" are held not actionable, because they "cannot reasonably be interpreted as stating actual facts" that could be proved false. *Milkovich*, 497 U.S. at 20, 25, 110 S.Ct. 2695; *see also Treppel v. Biovail Corp.*, No. 03 Civ. 3002(PKL), 2004 WL 2339759, at *12

(S.D.N.Y. Oct. 15, 2004) (stating that "an opinion may be offered with such excessive language that a reasonable audience may not fairly conclude that the opinion has any basis in fact" and noting that the Supreme Court in *Milkovich* "afforded constitutional protection to the type of speech often characterized as 'rhetorical hyperbole,' 'parody,' 'loose,' or 'figurative' ").

 "A statement of pure opinion is one which is either accompanied by a recitation of the facts upon which it is based or does not imply that it is based upon undisclosed facts." *Biro*, 883 F.Supp.2d at 461 (quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289, 508 N.Y.S.2d 901, 501 N.E.2d 550 (N.Y.1986) (internal quotation marks omitted)). A statement may still be actionable if it "impl[ies] that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader." *Levin*, 119 F.3d at 197. These statements may be actionable "not because they convey 'false opinions' but rather because a reasonable listener or reader would infer that the speaker or writer knows certain facts, unknown to the audience, which support the opinion and are detrimental to the person toward whom the communication is directed." *Gross*, 82 N.Y.2d at 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (quoting *Steinhilber*, 68 N.Y.2d at 290, 508 N.Y.S.2d 901, 501 N.E.2d 550) (internal quotation marks and brackets omitted); *see also Levin*, 119 F.3d at 196 (noting that the Supreme Court in *Milkovich* "explained that the United States Constitution offers no wholesale protection for so-called 'expressions of opinion' if those expressions imply assertions of objective fact"). Hence, a statement of opinion based on undisclosed facts may be actionable because it implicitly asserts those facts. *See Biro*, 883 F.Supp.2d at 461. "On the other hand, 'a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture.' " *Id.* (quoting *Gross*, 82 N.Y.2d at 154, 603 N.Y.S.2d 813, 623 N.E.2d 1163).

### b. Fair and True Report Privilege

New York Civil Rights Law Section 74 provides:

A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

The New York Court of Appeals has explained that "[t]he purpose of Civil Rights Law § 74 is the protection of reports of judicial proceedings which are made in the public interest." *Cholowsky v. Civiletti*, 69 A.D.3d 110, 887 N.Y.S.2d 592, 595 (2d Dep't 2009) (citation and internal quotation marks omitted). "The fair and true report privilege has been described as an absolute privilege that is not defeated by the presence of malice or bad faith." *Biro*, 883 F.Supp.2d at 477 (citations and internal quotation marks omitted).

 A statement is deemed a fair and true report if it is "substantially accurate." *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 119 (2005) (citations omitted). "A report is 'substantially accurate' if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Id.* (citations omitted). Thus, the New York Court of Appeals has remarked that "[a] fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated." *Holy Spirit Ass'n for Unification of World*

*Christianity v. N.Y. Times Co.,* 49 N.Y.2d 63, 424 N.Y.S.2d 165, 167, 399 N.E.2d 1185 (1979). However, "Section 74 does not afford protection if the specific statements at issue, considered in their context, 'suggest[ ] more serious conduct than that actually suggested in the official proceeding.'" *Calvin Klein Trademark Trust v. Wachner,* 129 F.Supp.2d 248, 253 (S.D.N.Y.2001) (quoting *Daniel Goldreyer, Ltd. v. Van de Wetering,* 217 A.D.2d 434, 630 N.Y.S.2d 18, 22 (1st Dep't 1995)).

▆▆▆▆ "Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within § 74's privilege." *Lacher v. Engel,* 33 A.D.3d 10, 817 N.Y.S.2d 37, 43 (1st Dep't 2006); *see also Fuji Photo Film U.S.A., Inc. v. McNulty,* 669 F.Supp.2d 405, at 414–15 (S.D.N.Y. 2009) (dismissing a defamation counterclaim where the statement "[did] not imply that [counterclaimant] engaged in any misconduct other than that alleged in the Complaint" in another action). The absolute privilege under Section 74 also "extends to the release of background material with regard to the case, so long as the statement is a substantially accurate description of the allegation," including "where the description of the case is offered by a party's legal counsel." *Fishof v. Abady,* 280 A.D.2d 417, 720 N.Y.S.2d 505, 505 (1st Dep't 2001) (citations omitted). New York courts have held that "once it is established that the publication is reporting on a judicial proceeding, how a reporter gathers his information concerning a judicial proceeding is immaterial provided his [or her] story is a fair and substantially accurate portrayal of the events in question." *Cholowsky,* 887 N.Y.S.2d at 596. Thus, the fact that a defendant "derive[s] information about the judicial proceedings from secondary sources [does] not mean that Civil Rights Law § 74 [is]

inapplicable." *Id.* There is also "no requirement that the publication report the plaintiff's side of the controversy." *Id.*

## 2. The Statements

Defendants argue that the various statements made by Hai are not susceptible of defamatory connotation, are not of and concerning Plaintiff, are pure opinion, and/or are fair and true reports of a judicial proceeding.

### a. Bestiality Statement

As noted, on September 26, 2012, Defendant published the following statement on the Blog:

> But, what disgusted me the most was that Sang Lan allowed Huang Jian to sexually ill-treat her dog Xiaomei. That day during a meal at their home, the two of them said that Xiaomei had a strong sex drive, and always rode on Huang Jian. Sang Lan said Huang Jian wanted to sexually assault Xiaomei by wearing condoms. I immediately said 'Shut up!' I could not listen to that any more. It was disgusting. I am a determined animal defender. Have they no shame? Since then, I particularly disliked them.

Defendants argue that "there is no precise meaning behind the statement that is readily understood" and that it conveys "Mr. Hai's opinion as to why he dislikes Plaintiff and Huan Jian." (Defs.' Mem. at 11). They also argue that the statement "is not 'of or concerning' Plaintiff as is required to sustain a cause of action for defamation." (Defs.' Rep. at 1).

▆▆▆ First, this statement is sufficiently "of and concerning" Plaintiff. Though it is Huang Jian who is accused of specific sexual misconduct, the first sentence of the Bestiality Statement concerns not Huang Jian's conduct itself, but "Sang Lan][''s] allow[ing] Huang Jian to sexually ill-treat her dog Xiamei." In other words, the first

sentence of the Bestiality Statement—as well as the statement taken as a whole—relates not just to Huang Jian's actions, but also to Plaintiff complicity therein.

■ Second, the statement—if false, as Plaintiff alleges—is potentially defamatory in nature. Statements suggesting one's complicity in, or approval of, sexual conduct with her dog subject one to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . [induce] an evil opinion of one in the minds of right-thinking persons, and . . . [deprive] one of . . . confidence and friendly intercourse in society." *Karedes*, 423 F.3d at 113. Indeed, the Bestiality Statement itself directs much, if not the majority, of its contempt towards Plaintiff as her boyfriend's aider and abettor. (*See* Compl. at ¶ 17 ("But, what disgusted me the most was that *Sang Lan allowed* Huang Jian to sexually ill-treat her dog Xiaomei. . . . I immediately said 'Shut up!' I could not listen to that any more. It was disgusting. I am a determined animal defender. Have *they* no shame? Since then, I particularly disliked *them*." (emphasis added)).[4]

■ Nor, contrary to Defendants' argument, is the statement pure opinion. Rather, the statements that "Sang Lan allowed Huang Jian to sexually ill-treat her dog Xiaomei," and that "Sang Lan said Huang Jian wanted to sexually assault Xiaomei by wearing condoms" have precise meanings that are readily understood and are capable of being true or false. The Bestiality Statement signifies to the reader that Hai is not merely surmising Sang and Jian's sexual proclivities, but rather is re-laying a conversation he had with the couple.

Thus, Plaintiff's defamation claim as to the Bestiality Statement survives Defendants' motion to dismiss.

### b. Mistress Statements

As discussed, between September 21, 2012 and September 26, 2012, Hai published the following statements on the Blog:

(1) "Lan Sang said that if Huan Jian abandoned her, then she would come to the United States and be Hai Ming's mistress."

(2) "She also told me how bad my wife is and how nice she is."

(3) "Would I accept this mistress? I helped her because I didn't think I was a nice guy, and I would like to help the disabled to accumulate virtue for myself. But, out of expectation, I got bitten by the snake."

■ Defendants argue that the first two Mistress Statements are incapable of being proven true or false and have no readily understood meaning. (*See* Defs.' Mem. at 11; Defs.' Rep. at 4–5). These arguments lack merit. Whether or not Plaintiff *said* that she might come to the United States and become Hai's mistress is capable of being proven true or false, as is whether Plaintiff *told* Hai "how bad my wife is and how nice she is." Furthermore, these statements—particularly when viewed together—are reasonably susceptible of defamatory meaning, as they patently suggest that Plaintiff made romantic advances at Hai, and attempted to induce him to carry on an extramarital affair. A reasonable jury could find that, together, they subject Plaintiff to the requisite "pub-

---

4. Moreover, while one might infer from the statement that Plaintiff and Huang Jian were simply engaging in a crass joke, the Bestiality Statement itself strongly suggests that Hai believed the canine to be in real danger of being the victim of unwanted inter-species sexual conduct. Otherwise, it is unclear why Hai exclaimed at the end of the Bestiality Statement that his outrage stemmed from his determination to defend animals.

lic hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace....." *Karedes,* 423 F.3d at 113.

 The third Mistress Statement is also possibly susceptible of defamatory connotation. Of course, Hai's musings about whether he would carry on an affair with Plaintiff are pure opinion, and hence cannot be defamatory. However, Hai's cryptic assertion that "I got bitten by the snake" is another matter. While the context and language suggests that Hai is expressing his opinion of Plaintiff, the statement arguably "impl[ies] the existence of undisclosed facts on which those opinions were based." *Biro,* 883 F.Supp.2d at 462. The statement may suggest, in other words, that, despite the fact that Hai took on Plaintiff's case as an act of altruism, Plaintiff committed some sort of sinister act against Hai. Until more is known about the context in which this statement was made, the Court cannot determine as a matter of a law that the statement is not reasonably susceptible of defamatory connotation.

Accordingly, the Mistress Statements are reasonably susceptible of defamatory connotation.

#### c. Criminal Activity Statements

 As noted above, Hai published the following statements in March and September 2012:

(1) Sang Lan has defaulted on her rent and stole the keys. She also accused me of misleading her.

(2) Lang San provided me falsified evidence for her case.

Defendants allege that the first Criminal Activity Statement is not reasonably sus-

ceptible of defamatory connotation. (*See* Defs.' Mem. at 8). According to Defendants, this is simply "a statement indicating that [Plaintiff] is having financial difficulty at best. The Court would have to give the words strained construction in order to find them actionable." (Defs.' Mem. at 8).

 Despite Defendants' protestations to the contrary, a statement averring that a person is a thief is defamatory in nature. It may well be that many people steal because they are in financial difficulty, but it is simply beyond dispute that thieves are subject to "public hatred [and] shame" *Karedes,* 423 F.3d at 113; *accord Atkins v. Bohrer,* No. 11 Civ. 4939(DLC), 2011 WL 6779311, at *7 (S.D.N.Y. Dec. 23, 2011) (declining to dismiss defamation claim arising from the defendant's statement that the plaintiff was "a thief"); *Biro,* 883 F.Supp.2d at 462 (statement that plaintiff is a "con man" was found "reasonably capable of a defamatory meaning").[5]

 Defendants' argument that the second Criminal Activity Statement is not reasonably susceptible of defamatory connotation is similarly unpersuasive. According to Defendants, Hai's statement that "Lang San provided me falsified evidence for her case" is not defamatory because it "does not even allege that Plaintiff falsified evidence.... At worst, this statement alleges that Plaintiff provided evidence to Defendants that was false, regardless of whether Plaintiff knew such evidence was false, or falsified such evidence herself." (Defs.' Mem. at 9). It is technically true, of course, that Plaintiff may have unknowingly provided Defendants with falsified evidence, but it is

---

**5.** The Court agrees with Defendants that the statement "She also accused me of misleading her" is not susceptible of defamatory connotation. To the extent that Plaintiff purports

to allege that that statement is defamatory on its own, that claim is dismissed. (*See* Defs.' Mem. at 8).

nonetheless undeniable that a reasonable person might interpret Hai's accusation as suggesting that Plaintiff purposefully gave Defendants falsified evidence. If false, an accusation that one provided her attorney with false information amounts to a claim that she attempted to use her lawyer to get false evidence into a legal proceeding. Such an accusation is defamatory in nature.

### d. The Lawsuit Statement

■ Again, at a press conference on or about October 21, 2011, Hai allegedly made the following statement:

> I won prosecution for delinquent legal fees for all 12 charges against Lan Sang.... [B]ecause [Lan Sang] did not appear in the Court, the Court granted a default judgment, a default judgment means that all of our prosecution was approved, all of the counterclaims of the Defendants were rejected. We sued for 12 charges; each charge is for $25,000; so we won $300,000.

Defendants argue that this statement is protected by the fair and true report privilege, and that it is not reasonably susceptible of defamatory connotation.

Although it is not entirely clear from the documents before the Court at this time, it appears that, at the time Hai made the above statement, a default judgment had been entered against Plaintiff in the case against Hai. (*See* Dkt. No. 11, Exs. D, E.) Therefore, when made, the first two sentences of the Lawsuit Statement appear to have been true. Later, Plaintiff seems to have convinced the state court to excuse her default, but that does not render Hai's statement any less true at the time it was made. (*See* Dkt. No. 11, Ex. E). Moreover, while the Court may not have yet awarded the $300,000, it was "substantially accurate" for Hai to state that he had would be entitled to those damages.

■ Even if the fair and true report privilege were not to apply here, Plaintiff's claim as to the Lawsuit Statement would be dismissed, as the statement is not reasonably susceptible of defamatory connotation. A statement alleging that a party defaulted in a lawsuit tends to suggest that the party is negligent or forgetful, or that she is not well informed about the workings of the justice system. Such connotations do not subject Plaintiff to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... [induce] an evil opinion of one in the minds of right-thinking persons ...'" *Karedes*, 423 F.3d at 113.

Plaintiff's defamation claim as to the Lawsuit Statement is therefore dismissed.

### 3. Damages

Defendants also argue that Plaintiff's claims for defamation must fail because she has failed either to plead special damages or to demonstrate that the statements were defamatory per se. (*See* Defs.' Mem. at 13–15). The Court disagrees.

■ Generally, in order to prove defamation under New York law, a plaintiff must provide evidence of special damages, which consist of "the loss of something having economic or pecuniary value." *Celle*, 209 F.3d at 179 (quoting *Matherson v. Marchello*, 100 A.D.2d 233, 235, 473 N.Y.S.2d 998 (2d Dep't 1984)). Proof of special damages is unnecessary where the defamatory statement fits "within an exception in which damages are presumed," namely libel per se or slander per se. *Sharratt v. Hickey*, 20 A.D.3d 734, 799 N.Y.S.2d 299, 301 (2005); *see also Fleming v. Hymes–Esposito*, No. 12 Civ. 1154(JPO), 2013 WL 1285431, at *7 (S.D.N.Y. March 29, 2013) (describing the requirement of special damages for slander cases); *Spre-*

*well v. NYP Holdings, Inc.*, 1 Misc.3d 847, 772 N.Y.S.2d 188, 196 (2003) (requiring special damages for libel cases under New York law).

 Special damages "must flow directly from the injury to reputation caused by the defamation[,] not from the effects of defamation," *Celle*, 209 F.3d at 179 (quoting *Matherson*, 473 N.Y.S.2d at 1000), and "must be fully and accurately identified, with sufficient particularity to identify actual losses," *Thai v. Cayre Group, Ltd.*, 726 F.Supp.2d 323, 330 (S.D.N.Y.2010) (citing *Celle*, 209 F.3d at 179). "The individuals 'who ceased to be customers, or who refused to purchase, must be named' and the exact damages itemized." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir.2002) (quoting *Drug Research Corp. v. Curtis Publ'g Co.*, 7 N.Y.2d 435, 441–42, 199 N.Y.S.2d 33, 166 N.E.2d 319 (N.Y.1960)).

 In the SAC, Plaintiff provides a list of companies that sponsored her prior to the alleged defamatory statements and itemizes the amount of each sponsorship. She also alleges that the direct cause of her losses of these sponsors was the Defendants' allegedly defamatory statements. Thus, she has identified special damages "with sufficient particularity to identify actual losses," and she sufficiently supports the contention that the harm "[flowed] directly from the injury to reputation cause[d] by the defamation." Accordingly, Plaintiff has sufficiently alleged special damages.[6]

### 4. Conclusion

In sum, Plaintiff's defamation claims as to the Bestiality Statement, the Mistress Statements, and the Criminal Activity Statements survive. Plaintiff's defamation claim as to the Lawsuit statement is dismissed.

### E. Invasion of Privacy Claim

Defendants next move to dismiss Plaintiff's claim for invasion of privacy, pursuant to Sections 50 and 51 of the New York Civil Rights Law.

 "New York does not recognize a common-law right of privacy." *Messenger v. Gruner + Jahr Printing & Publ'g*, 94 N.Y.2d 436, 441, 706 N.Y.S.2d 52, 727 N.E.2d 549 (N.Y.2000). Instead, Civil Rights Law Sections 50 and 51 provide a "limited statutory right of privacy." *Id.* Section 50 makes it a misdemeanor to (1) "use a living person's name, portrait or picture," (2) "for advertising or trade purposes," and (3) "without first obtaining his or her written authorization." *Bement v. N.Y.P. Holdings, Inc.*, 307 A.D.2d 86, 89, 760 N.Y.S.2d 133 (1st Dep't 2003). Section 51 provides "that an aggrieved person may maintain an equitable action to prevent such unauthorized use and may also sue to recover damages sustained as a result." *Id.* at 89–90, 760 N.Y.S.2d 133. The legislature crafted these sections "narrowly to encompass only the commercial use of an individual's name or likeness and no more." *Humane League of Phila., Inc. v. Berman & Co.*, No. 117363/09 (JSS), 2010 WL 4552833, at *4 (N.Y.Sup.Ct. Nov. 1, 2010) (quoting *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 439, 449 N.Y.S.2d 941, 434 N.E.2d 1319 (N.Y.1982)).

---

**6.** Even had Plaintiff failed to allege special damages, it is clear that many of the statements constitute defamation per se, either because they impute unchastity to Plaintiff, *see* New York Civil Rights Law § 77; *see also Haynes v. Ritchey*, 30 Iowa 76 (1870) (falsely alleging that a woman committed bestiality constitutes an imputation of a woman's chastity and is thus defamation *per se* ), or because they charge Plaintiff with a serious crime, *see Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992).

Because of its potential conflict with the First Amendment, the right to privacy granted by the Civil Rights law has been strictly construed. *See Mason v. Jews for Jesus,* No. 06 Civ. 6433(RMB), 2006 WL 3230279, at *2 (S.D.N.Y. Nov. 8, 2006). Recognizing the tension between the First Amendment and a broad construction of the privacy laws, the New York Court of Appeals has determined that newsworthy articles and articles on matters of public interest are exempted from this statutory right. *See Messenger,* 94 N.Y.2d at 441, 706 N.Y.S.2d 52, 727 N.E.2d 549.

"[N]ewsworthiness is to be broadly construed." *Bement,* 307 A.D.2d at 90, 760 N.Y.S.2d 133 (internal quotation marks and citation omitted). The exception "includes not only descriptions of actual events, but also articles concerning political happenings, social trends, or any subject of public interest." *Messenger,* 94 N.Y.2d at 441–42, 706 N.Y.S.2d 52, 727 N.E.2d 549 (citations omitted). "Whether an item is newsworthy depends solely on 'the content of the article'—not the publisher's 'motive to increase circulation.'" *Bement,* 307 A.D.2d at 90, 760 N.Y.S.2d 133 (quoting *Messenger,* 94 N.Y.2d at 441–42, 706 N.Y.S.2d 52, 727 N.E.2d 549). The newsworthiness doctrine applies "regardless of any false implication that might be reasonably drawn from the use of [plaintiff's name or image]." *Messenger,* 94 N.Y.2d at 444, 706 N.Y.S.2d 52, 727 N.E.2d 549. "Significantly, the fact that a publication may have used a person's name or likeness solely or primarily to increase the circulation of a newsworthy article—and thus to increase profits—does not mean that the *name or likeness* has been used for trade purposes within the meaning of the statute. Indeed, most publications seek to increase their circulation and also their profits." *Id.* (quoting *Stephano v. News Grp. Publs.,* 64 N.Y.2d 174, 184–185,

485 N.Y.S.2d 220, 474 N.E.2d 580 (N.Y. 1984)). As a result, courts have determined that a wide array of articles, including some "not readily recognized as 'hard news,'" fall under the "newsworthy" exception. *Id.*

If the publication in which a plaintiff's photograph appears is newsworthy under New York law, a defendant is shielded from liability *as long as* "the photograph bears a real relationship to a newsworthy article and is not an advertisement in disguise." *Messenger,* 94 N.Y.2d at 448, 706 N.Y.S.2d 52, 727 N.E.2d 549. "Where those requirements are met, there is no cause of action under the Civil Rights Law." *Id.* Stated differently, despite the newsworthiness of an article, Sections 50 and 51 may nonetheless have force where (1) the photograph has "no real relationship to the article" or (2) "the article is an advertisement in disguise." *Zoll v. Jordache Enters., Inc.,* No. 01 Civ. 1339(CSH), 2003 WL 1964054, at *7 (S.D.N.Y. Apr. 24, 2003) (quoting *Messenger,* 94 N.Y.2d at 442–43, 706 N.Y.S.2d 52, 727 N.E.2d 549).

Assuming *arguendo* that Plaintiff's likeness was used in conjunction with newsworthy articles, Plaintiff has sufficiently alleged that the Blog was "designed to attract business for the Defendants' law practice" and that its content "consisted overwhelmingly of matters related to Defendants' law practice, open cases, clients, and former clients." (SAC at ¶ 41). She also alleges that Defendants acquired "fees and revenues" due to "the attention garnered by the use of Plaintiff's likeness" in the law blog. (*Id.* at ¶ 42). Discovery may well reveal that the purpose of the Blog is in fact to distribute news to the public. At this juncture, however, the Court must assume, as Plaintiff alleges,

that the blog is merely an "advertisement in disguise."[7]

Thus, Plaintiff's invasion of privacy claim survives Defendants' motion to dismiss.

## F. Breach of Contract Claim

 "Under New York law, the elements of a breach of contract claim are (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Swan Media Grp., Inc. v. Staub*, 841 F.Supp.2d 804, 807 (S.D.N.Y.2012) (citation omitted). At the pleading stage, a plaintiff alleging breach of contract must, "at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion." *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F.Supp. 276, 286 (S.D.N.Y.1991) (citation omitted); *accord Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).

 Plaintiff alleges that she entered into a contractual relationship with Defendants (SAC at ¶ 53), and that Hai breached his contractual duties by, *inter alia*, "not [being] forthcoming with the tribunal in Plaintiff's federal court case" and by failing in "his duty of diligence on multiple occasions" (*id.* at ¶ 54). However, Plaintiff does not allege which specific terms of the parties' contract Defendants breached. Without stating which specific terms of the contract have been breached, a complaint fails to provide the defendant with sufficient notice to defend the claim. Because Plaintiff's breach of contract claim lacks the specificity required by Rule 12(b)(6) and Rule 8, the claim must be dismissed.

## G. The Tortious Interference with Contract Claim

 "Under New York law in order to sustain a claim for tortious interference with contract a plaintiff must show: '(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff.'" *Howe v. Bank of N.Y. Mellon*, 783 F.Supp.2d 466, 480 (S.D.N.Y.2011) (quoting *Albert v. Loksen*, 239 F.3d 256, 274 (2nd Cir.2001)).

 Plaintiff alleges that she lost a significant number of sponsorships "due to the ... alleged use of Plaintiff's image and [the published] false stories about Plaintiff." (SAC at ¶ 59). She then claims that the Defendants knew about the contracts and "intentionally induced the breach[es] ... by the publication of [defamatory] statements ... and the use of [Plaintiff's] image without authorization." (*Id.* at ¶ 61). Plaintiff has failed, however, to set forth any factual allegations suggesting that Defendants knew about Plaintiff's contracts, or that Defendants intentionally procured the breach of those contracts. Accordingly, Plaintiff fails to state a claim for tortious interference with a contract pursuant to Rule 12(b)(6).

## H. The Tortious Interference with Business Relations Claim

 "To state a claim for tortious interference with business relations, a

7. Moreover, Plaintiff has sufficiently alleged that Hai used her photographs and name without her consent. (*See* SAC at ¶ 53 (Hai "constantly published numerous photographs of the Plaintiff without her written permission" and "published a photograph of Lan Sang's likeness next to each of the [blog entries] without her permission."); *see also id.* at ¶ 45 (Hai "needlessly [called] press conference to discuss Lan Sang's confidences and promulgate falsities both during and after his representation of Plaintiff.")).

plaintiff must adequately allege that: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.,* 455 Fed.Appx. 102, 105 (2d Cir. 2012) (internal quotations marks omitted) (citing *Catskill Dev., L.L.C. v. Park Place Ent't Corp.,* 547 F.3d 115, 132 (2d Cir. 2008)). In order to satisfy the "wrongful purpose" requirement, "the defendant's conduct must amount to a crime or an independent tort" or defendant's conduct must have been "for the sole purpose of inflicting intentional harm on plaintiffs." *Id.* at 106 (citations omitted). Moreover, "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 192, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (N.Y. 2004); *see also Piccoli A/S v. Calvin Klein Jeanswear Co.,* 19 F.Supp.2d 157, 167–168 (S.D.N.Y.1998) (claim fails because "defendants' alleged conduct concededly was not directed towards any third party with whom Piccoli had an existing or prospective business relationship"); *Fonar Corp. v. Magnetic Resonance Plus, Inc.,* 957 F.Supp. 477, 482 (S.D.N.Y.1997) ("It is clear ... that under New York law, in order for a party to make out a claim for tortious interference with prospective economic advantage, the defendant must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.")

■ Plaintiff claims that "Defendants caused future sponsors and other unknown employers to not enter future contracts with Plaintiff." (SAC at ¶ 64). She explains that she was "in the middle of negotiations with Disney," but that Disney abruptly stopped its negotiations "[a]fter the publicity created by Defendants' statements." (SAC at ¶ 65). Plaintiff has not alleged, however, that Defendants' conduct was in any way directed toward Disney or any other third party with whom Plaintiff had an existing or prospective business relationship. Plaintiff's tortious inference with a business relation claim therefore must fail.

## I. Breach of Fiduciary Duty Claim

■■ Under New York law, a claim for a breach of fiduciary duty requires "(1) that the defendant owed [plaintiff] a cognizable duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach." *Di Benedetto v. Pan Am World Serv.,* 359 F.3d 627, 630 (2d Cir. 2004) (citing *Solomon by Solomon v. City of New York,* 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 489 N.E.2d 1294 (N.Y.1985)). Without damages, a claim for breach of duty must fail.

■ "To plead proximate cause, the complaint must allege that Plaintiffs' injury was a direct or reasonably foreseeable result of [the defendant's] conduct." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Securities LLC,* 568 F.3d 374, 381 (2d Cir.2009); *see also In re Refco Inc. Sec. Litig.,* 826 F.Supp.2d 478, 514 (S.D.N.Y.2011) ("[W]here 'damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that defendant's conduct proximately caused injury in order to establish liability.'" (citing *LNC Invs. v.*

*First Fidelity Bank, N.A.,* 173 F.3d 454, 465 (2d Cir.1999))).

 "[A]n attorney stands in a fiduciary relationship to the client, a relationship that imposes a set of special duties." *Schweizer v. Mulvehill,* 93 F.Supp.2d 376, 401 (S.D.N.Y.2000) (citing, *inter alia, Graubard Mollen Dannett & Horowitz v. Moskovitz,* 86 N.Y.2d 112, 118, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (N.Y. 1995)); *but see Sullivan & Cromwell LLP v. Charney,* 15 Misc.3d 1128(A), 2007 WL 1240437, at *5 (N.Y.Sup.Ct.2007) ("Under New York law, an attorney's violation of a disciplinary rule does not, by itself, give rise to a cause of action by his client for breach of fiduciary duty."). As the New York Court of Appeals has explained:

> The attorney's obligations [to the client] transcend those prevailing in the commercial marketplace. The duty to deal fairly, honestly, and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the clients' interest over the attorney's.

*In re Cooperman,* 83 N.Y.2d 465, 472, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (N.Y.1994) (citations omitted). A communication to an attorney is not confidential unless it is made in the process of obtaining legal advice. *Pem–America, Inc. v. Sunham Home Fashions, LLC,* No. 03 Civ. 1377(JFK)(RLE), 2007 WL 3226156, at *2

(S.D.N.Y. Oct. 31, 2007); *accord Priest v. Hennessy,* 51 N.Y.2d 62, 431 N.Y.S.2d 511, 514, 409 N.E.2d 983 (1980) (explaining that "[an attorney-client] relationship arises only when one contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services").

 Plaintiff specifically mentions one occasion on which Hai breached his fiduciary duty "by disclosing, without the Plaintiff's authorization, confidential material to the public." (SAC at ¶ 70.)[8] This alleged breach occurred "in or about September of 2011," when Hai suggested to a reporter that "Plaintiff has only started her lawsuit to obtain a green card." *Id.* If Hai did indeed make such a statement, it seems likely that it was based upon confidential information provided by Plaintiff in the process of acquiring legal advice.[9] However, Plaintiff does not specifically allege that Hai's statement caused her any pecuniary harm.

Accordingly, Plaintiff's breach of fiduciary duty claim is dismissed.

## J. Intentional Infliction of Emotional Distress Claim

 In order to state a claim for intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must allege: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Guan N. v. New York City Dep't of Educ.,* No. 11 Civ.

---

**8.** Defendant also generally alleges breaches of the duties of loyalty and trust. However, to the extent that these claims are broader than her breach of confidentiality claim, they are duplicative of her defamation claims. *See O'Brien v. Alexander,* 898 F.Supp. 162, 172 (S.D.N.Y.1995) (Chin, J.) ("Where tort claims essentially restate a defamation claim that has been dismissed on a motion to dismiss, the tort claims must also be dismissed."). More-

over, these claims are insufficiently pleaded under *Iqbal* and *Twombly.*

**9.** Thus, Hai may well have violated Rule 1.6 of the New York Rules of Professional Conduct. Again, however, while this may reflect on Hai's suitability to practice law in this state, it does not necessarily give rise to a cause of action for breach of fiduciary duty.

4299(AJN), 2013 WL 67604, at \*25 (S.D.N.Y. Jan. 7, 2013) (citing *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir.1996)); *see also Howell v. New York Post Company, Inc.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993).

"[T]he rigor of the outrageousness standard is well established." *Mesa v. City of N.Y.*, No. 09 Civ. 10464(JPO), 2013 WL 31002, at \*28 (S.D.N.Y. Jan. 3, 2013). Conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Sullivan v. Andino*, No. 09 Civ. 3668(VB), 2012 WL 4714766, at \*7 (S.D.N.Y. Sept. 18, 2012) (citing *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (N.Y. 1983)). Recovery for IIED claims is available "only where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation." *Hanly v. Powell Goldstein, LLP*, No. 05 Civ. 5089(KMW), 2007 WL 747806, at \*6 (S.D.N.Y. Mar. 5, 2007) (citing *Owen v. Leventritt*, 174 A.D.2d 471, 571 N.Y.S.2d 25, 25 (1st Dep't 1991)). This threshold is exceedingly difficult to meet. *Compare Seltzer v. Bayer*, 272 A.D.2d 263, 709 N.Y.S.2d 21, 23 (1st Dep't 2000) (holding that the defendant's alleged dumping of a pile of cement, tossing of lighted cigarettes, and drawing of a swastika on his neighbor's house did not constitute conduct sufficiently outrageous to survive a motion for summary judgment); *Leibowitz v. Bank Leumi Trust Co. of N.Y.*, 152 A.D.2d 169, 548 N.Y.S.2d 513, 514 (2d Dep't 1989) (affirming dismissal of IIED claim where plaintiff alleged she was frequently the subject of derogatory, racist remarks); *Moye v. Gary*, 595 F.Supp. 738, 739–40 (S.D.N.Y.1984) (dismissing an IIED claim when defendant "verbally harassed and insulted [plaintiff] in front of her daughter, and ... called [her] a 'fag' and a 'poor woman.'"), *with Klinge v. Ithaca College*, 167 Misc.2d 458, 467, 634 N.Y.S.2d 1000 (N.Y.Sup.Ct.1995) (holding that a jury could find that "an unprivileged publication of a charge of plagiarism in an academic community, if false or made with reckless indifference to its truth ... amounts to 'extreme and outrageous' conduct").

The statements allegedly made by Hai were mean-spirited and undoubtedly painful to Plaintiff. They were not, however, sufficiently "outrageous in character" or "extreme in degree" to constitute the stuff of an IIED claim. Accordingly, Plaintiff's IIED claim must be dismissed.[10]

### K. Permanent Injunction

Finally, Defendants move to dismiss Plaintiff's request for a permanent

---

10. Moreover, IIED claims are routinely dismissed where they "fall[] well within the ambit of other traditional tort liability." *Gonzalez v. Bratton*, 48 Fed.Appx. 363, 365 (2d Cir.2002) (citing *Fischer v. Maloney*, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (N.Y.1978)); *accord Herlihy v. Metropolitan Museum of Art*, 214 A.D.2d 250, 262, 633 N.Y.S.2d 106 (1st Dep't 1995) ("the plaintiff's cause of action for intentional infliction of emotional distress must also fail because it falls within the ambit of other traditional tort liability which, in this case, is reflected in plaintiff's causes of action sounding in defamation"); *Rivers v. Towers, Perrin, Forster & Crosby Inc.*, No. 07 Civ. 5441, 2009 WL 817852, at \*10 (E.D.N.Y. Mar. 27, 2009) ("plaintiff's intentional infliction of emotional distress claim should be dismissed because it is within the ambit of the tort of defamation"); *Fordham v. Islip Union Free Sch. Dist.*, 662 F.Supp.2d 261, 276 (E.D.N.Y.2009) (dismissing claim for intentional infliction of emotional distress where it "falls within the ambit of the tort of defamation"). Here, the IIED claim is well within the ambit of Plaintiff's defamation claims.

injunction.[11] A permanent injunction is warranted where a party has succeeded on the merits and can establish: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Kaupp v. Church*, No. 10 Civ. 7559(JFK), 2011 WL 4357492, at *4 (S.D.N.Y. Sept. 19, 2011) (citing *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010)).

 Plaintiff has not adequately pleaded that she has suffered an irreparable injury for which no other remedy at law provides adequate compensation. Moreover, an injunction in a situation such as this would not serve the public interest. "[P]ermanent injunctions ... are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993); *see also Metropolitan Opera Ass'n v. Local 100, Hotel Emps. & Restaurant Emps. Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001) (noting that prior restraints are "the most serious and the least tolerable infringement on First Amendment rights" (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976))). Thus, "[t]he usual rule is that 'equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.'" *Cmty. for Creative Non–Violence v. Pierce*, 814 F.2d 663, 672 (D.C.Cir.1987) (citation omitted). "Indeed, for almost a century the Second Circuit has subscribed to the majority view that, absent extraordinary circumstances,

injunctions should not ordinarily issue in defamation cases." *Metropolitan Opera Ass'n*, 239 F.3d at 177 (citing cases).

Accordingly, while Plaintiff may continue to seek money damages, the Court will not entertain her request for a permanent injunction.

## III. Conclusion

For the foregoing reasons, Defendants' motion is dismiss is GRANTED in part and DENIED in part. The defamation claim concerning the Lawsuit Statement is dismissed. The breach of contract, tortious interference with contract, tortious interference with business relations, intentional infliction of emotional distress claims, and fiduciary duty claim are also dismissed. Plaintiff's other claims survive. Defendants' request to transfer this case under the first-to-file doctrine is denied.

The Clerk of Court is directed to close the motion at Docket Number 20.

SO ORDERED.

---

**11.** Plaintiff styles her request for a permanent injunction as a separate cause of action. A permanent injunction, however, is a remedy, not a claim. *Kwan v. Schlein*, No. 05 Civ. 0459(SHS)(JCF), 2008 WL 4755345, at *4 (S.D.N.Y. Oct. 30, 2008)